Adam B. Nach – 013622
Helen K. Santilli – 032441
**LANE & NACH, P.C.**
2001 E. Campbell Avenue, Suite 103
Phoenix, AZ 85016
Telephone No.: (602) 258-6000
Facsimile No.: (602) 258-6003
Email: adam.nach@lane-nach.com
Email: helen.santilli@lane-nach.com

Holden Hoggatt – 32158
**Turbine Powered Technology, LLC**
General Counsel
298 Louisiana Road, Port of West St. Mary
Franklin, Louisiana USA 70538
Telephone: (337) 924-0298
Fax: (337) 924-0290
Email: holden@marineturbine.com

*Attorneys for Turbine Powered Technology, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>DAVID K. CROWE and COLLEEN M. CROWE,<br><br>Debtors. | (Chapter 11 Case)<br><br>Case No. 4:19-bk-04406-BMW<br><br>***Adv. No. 4:19-ap-00260-BMW*** |
| TURBINE POWERED TECHNOLOGY, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID K. CROWE and COLLEEN M. CROWE,<br><br>Defendants. | **NOTICE OF FILING SUPPLEMENTAL *EXHIBIT N* TO STATUS REPORT FOR RELATED LITIGATION** |

Turbine Powered Technology, LLC, through its undersigned counsel, herein files a supplemental **Exhibit N** to the Status Report for Related Litigation filed on January 31, 2020 at DE #45 in the adversary case 4:19-ap-00260-BMW. A copy of Exhibit N is attached hereto.

RESPECTFULLY SUBMITTED this 3rd day of February, 2020.

**Turbine Powered Technology, LLC**

/s/ Holden Hoggatt
Holden Hoggatt – 32158
General Counsel
*Attorney for Turbine Powered Technology, LLC*

**A COPY** of the foregoing sent by U.S. Mail and/or electronic delivery to:

Frederick J. Petersen
Isaac D. Rothschild
Mesch, Clark & Rothschild, P.C.
259 N. Meyer Avenue
Tucson, AZ 85701
Email: fpetersen@mcrazlaw.com
*Attorneys for Debtors*

By /s/ Terie Flowers Turner

EXHIBIT N

**STATE OF LOUISIANA**

**16th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. MARY**

**DOCKET NO. 130379** **DIV. "F"**

**TURBINE POWERED TECHNOLOGY, LLC**

**VERSUS**

**DAVID CROWE ET AL**

**MOTION FOR SUMMARY JUDGMENT**

Now into Court, through undersigned counsel, comes David Crowe, Arizona Turbine Technology, Inc., Kenneth Braccio, Advanced Turbine Services, LLC, George Jackson, and Donald I. Foley, Jr., and respectfully submit the following Motion for Summary Judgment:

1. Defendants move for summary judgment pursuant to La. C.C.P. art. 966, because the Plaintiff cannot prove one or more essential elements of its claims under LA R.S. 51:1431, the Louisiana Uniform Trade Secrets Act.

2. The Plaintiff cannot meet any of the prongs of the test for the existence of a trade secret in the first place: the information claimed as a trade secret is not actually secret, it is ascertainable by legal means, and it was not the subject of reasonable efforts to maintain its secrecy.

3. Even if the Plaintiff could show the existence of a specific trade secret in the first place, it could not show any Defendant used such allegedly secret information to the injury of the Plaintiff.

4. In further support of this Motion the Defendants incorporate the attached Memorandum in Support, Affidavits, and Exhibits, which thoroughly set forth the basis for granting the relief prayed for herein.

5. Wherefore, Defendants pray that this Motion be granted and a judgment issue in their favor dismissing all claims based upon LA R.S. 51:1431, the Louisiana Uniform Trade Secrets Act.

Respectfully submitted,

**Meade Young, LLC**

______________________________

Adam G. Young, 30124
John Alden Meade, 29975
556 Jefferson St., Box 7
Lafayette, Louisiana 70501
(337) 534-0200
(337) 210-7999
agy@meadeyoung.com

**Ramsay, Skiles & Streva**
S. Patrick Skiles, 26517
1915 Highway 182
Morgan City, Louisiana 70380
(985) 395-9247
(985) 395-3898 (fax)
pskiles@rsslawoffice.com

**T. Taylor Townsend, LLC**
Thomas T. Townsend (La. Bar 20021)
320 St. Denis St.
P.O. Box 784
Natchitoches, Louisiana 71458-0784
318-238-3612
318-238-6103 (fax)
taylor@taylortownsendlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record by facsimile, email and/or U.S. Mail, postage prepaid and properly addressed on this 7th day of December 2018.

______________________________
Adam G. Young

STATE OF LOUISIANA

16th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. MARY

DOCKET NO. 130379 DIV. "F"

TURBINE POWERED TECHNOLOGY, LLC

VERSUS

DAVID CROWE ET AL

**ORDER TO SHOW CAUSE ON MOTION FOR SUMMARY JUDGMENT**

Considering the foregoing Motion for Summary Judgment, Plaintiff is hereby ordered to show cause on the date and time set forth below why the Motion should not be granted, and relief entered in favor of the Defendants as prayed for therein.

Hearing date and time:____________________________________.

Done at Franklin, Louisiana this date: ______________________________.

________________________________

Judge, 16th Judicial District Court

Please serve:

Holden Hoggatt, Lauren Williams, or Ted McIntyre
Turbine Powered Technology, LLC
298 Louisiana Road
Franklin, Louisiana 70538

STATE OF LOUISIANA

16th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. MARY

DOCKET NO. 130379 DIV. "F"

TURBINE POWERED TECHNOLOGY, LLC

VERSUS

DAVID CROWE ET AL

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**May it please the Court:** Defendants David Crowe, Arizona Turbine Technology, Inc., Kenneth Braccio, Advanced Turbine Services, LLC, George Jackson, and Donald I. Foley, Jr. respectfully submit the following Memorandum in Support of their Motion for Summary Judgment as follows:

### Introduction and Summary of the Argument

All the Plaintiff's claims in this case depend on the premise that it has proprietary rights to some vaguely identified technology, frequently described as "turbine-driven hydraulic fracturing." In order for the claimed intellectual property to be protected under state law, it must qualify as a trade secret under the La. Uniform Trade Secrets Act.[1] In order to carry its burden of proof to show the existence of a trade secret, the Plaintiff must prove all three prongs of the trade secret test identified in LA R.S. 51:1431(4). After proving the existence of a trade secret in the first place, the Plaintiff must also prove that it was injured by the Defendants' unauthorized use of the claimed secret. The Defendants now bring this Motion for Summary Judgment and show that judgment in favor of the Defendant is warranted because the Defendant cannot prove all three prongs of the trade secret test under R.S. 51:1431(4). Furthermore, summary judgment is also warranted because even if

[1] LA R.S. 51:1431. As discussed in detail in other memoranda in this case, it is undisputed that the Plaintiff stakes its claim for the existence of "intellectual property" on the existence of a trade secret. Even though a US Patent has been issued encompassing the technology the Plaintiff claims as it's intellectual property, state courts lack subject matter jurisdiction over patent construction and enforcement of patent rights. *See Atl. Research Mktg. Sys., Inc. v. Troy,* 659 F.3d 1345, 1357 (Fed. Cir. 2011).

a specific trade secret existed, the Plaintiff cannot prove the Defendants actually used any of the claimed secret information to injure the Plaintiff.

## Summary Judgment Standard

When the party moving for summary judgment will not bear the burden of proof at trial, that party need only point out to the court the absence of factual support for one or more elements essential to the adverse party's claim.[2] When the party moving for summary judgment makes such a showing, the burden shifts to the "adverse party to produce factual support sufficient to establish a genuine issue of material fact."[3] The following argument shows the Plaintiff lacks factual support to prove either the existence of a trade secret in the first place, or the actual use of any alleged secret information by any Defendant to the injury of the Plaintiff. Therefore, Summary Judgment should issue in favor of the Defendants.

## Argument

The Court should grant the Defendants' Motion for Summary Judgment on the trade secrets cause of action, because the Plaintiff cannot show the existence of a trade secret in the first place. Furthermore, even if a trade secret did exist, the Plaintiff cannot carry its burden of proof to show any instance where the alleged trade secret was used by any Defendant to the injury of the Plaintiff.

### I. Plaintiff Cannot Carry Its Burden to Show the Existence of a Trade Secret in the First Place.

"The threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact."[4] The three elements of a trade secret under the La. Uniform Trade Secrets Act are as follows:

1. Trade secrets must be "not generally known to other persons."
2. Trade secrets must be "not readily ascertainable by proper means."
3. Trade secrets must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." [5]

---

[2] La. C.C.P art. 966(D)(1).
[3] *Id.*
[4] *Southern Marsh* 2017-0459 (11/1/2017).
[5] LA R.S. 51:1431(4); *Razorback Oil Tools Int'l, Inc. v. Taylor Oil Tools Co.*, 626 So. 2d 28, 33 (La. App. 1st 10/15/1993).

If a party cannot show all of the foregoing elements, then they cannot have a legally protectable trade secret.[6] TPT cannot carry its burden of proof on any of the foregoing three elements regarding its trade secret claims. Therefore, summary judgment should be granted in favor of the Defendants.

### A. What Plaintiff claims as a trade secret is not secret.

The intellectual property TPT claims to own as trade secrets is not secret information, because it is "generally known to other persons."[7] Because it is not secret, it fails to meet the first requirement under the La. Uniform Trade Secrets Act.[8] Therefore, summary judgment should issue in favor of the Defendant on all claims depending on the existence of trade secret.[9]

On the record in this case, TPT has described its trade secrets as follows:

- "Anything encompassing" "[t]urbine driven hydraulic fracturing and turbine driven power generation, in particular as it relates to T53, T55 and TF40 engines."[10]
- "Hydraulic fracturing utilizing T55, TF40 and T53 engines and power generation, as well, in the oil and gas industry."[11]
- "Controlling a turbine engine for hydraulic fracturing power generation"[12]
- "Digital engine controls for turbine hydraulic fracturing equipment."[13]

Later, in various pleadings, TPT has attempted to further define its trade secret as follows:

- A "newly-developed engine controls design" and "necessary parameters" for such control design "in the oil & gas extraction process."[14]
- "New controls including a digital controller for a hydraulic frac unit using a turbine engine."[15]

---

[6] *Id; Pontchartrain Med. Labs. Inc. v. Roche Biomedical Labs. Inc.*, 677 So. 2d 1086, 1090 (La. App. 1st Cir. 6/28/1996), *Engineered Mechanical Serv., Inc. v. Langlois*, 464 So. 2d 329, 333 (La. App. 1st Cir. 12/28/1984).
[7] LA R.S. 51:1431(4).
[8] *Id.*
[9] La. C.C.P. art. 966(D)(1).
[10] Exhibit A: Testimony of Ted McIntyre, 6/15/2017 at pp 189-190.
[11] *Id* at 190.
[12] *Id* at 192, 196.
[13] *Id* at 194
[14] Second Amended Complaint at ¶108.
[15] Exhibit B, TPT's Brief to La. Court of Appeal in 2018-CA-0881, at p. 2.

### 1. Turbine-powered hydraulic fracturing is not secret.

TPT's broadest claim, that turbine-powered hydraulic fracturing itself is a trade secret, cannot be true, because controlling turbines to power high pressure pumps in hydraulic fracturing for oil and gas production is not secret. This method has been used since at least 1966, and at present firms other than TPT use turbines to power hydraulic fracturing operations.

#### a. Turbine-powered hydraulic fracturing is a known technology that has been around for decades.

For more than fifty years, turbine engines—such as from military helicopters and planes—have been repurposed for use in various industrial applications, including hydraulic fracturing pumps, in the United States and around the world.[16] For example, the figure below "shows a two-shaft gas turbine powered pump unit that was placed in field service during 1966."[17]



**Fig. 8.9** Two-shaft gas turbine engine driving a positive displacement pump.

The American oil & gas industry continues to find new ways to use and improve turbine engines to power hydraulic fracturing operations. For example, in March, 2018, Chris Combs, the vice president for Evolution Well Services was widely quoted

[16] *Hydraulic Fracturing*, G. C. Howard, C. R. Fast Henry L. Doherty Memorial Fund of AIME, Society of Petroleum Engineers of AIME, 1970.
[17] *Id.*

by the American Oil & Gas Reporter discussing his company's advantages of turbine-powered hydraulic fracturing compared to conventional methods.[18] Evolution well services is a distinct entity from TPT, and it is not a licensee. Therefore, using turbine engines in hydraulic fracturing is not something "not generally known to other persons." Therefore, the Plaintiff's claim fails to meet the first prong of the trade secrets test.

**b. Firms other than TPT use turbines in hydraulic fracturing.**

At least two other firms, Vericor and General Electric, presently supply gas turbine engines for use in hydraulic fracturing operations.[19] Vericor uses the T55 Lycoming turbine engine for this purpose, the very same type of engine over which the Plaintiff claims trade secrets.[20] The historical and continuing existence of turbine-powered hydraulic fracturing in the oil and gas industry belies the Plaintiff's claim that such is a secret. Therefore, using turbine engines in hydraulic fracturing is not something "not generally known to other persons," and cannot be a trade secret.[21]

**2. Using digital engine controls on turbines for hydraulic fracturing is not secret.**

A "FADEC", or fully authorized digital engine controller, is a generic term for a digital controller for a turbine engine.[22] In turbine-powered fracking, a FADEC controls the turbine engine and by controlling the engine one can control the pump and thus, the rate of the flow of high-pressure liquids in a hydro-fracking operation.[23] TPT claims to possess a trade secret on all turbine driven frack equipment with a digital engine controller.[24] This is not a secret however, because many companies already use digital engine controllers—FADECs—with turbine driven frack equipment.

---

[18] https://www.aogr.com/magazine/frac-facts/latest-frac-fleets-are-tougher-faster, "Latest Frac Fleets Are Tougher, Faster," American Oil & Gas Reporter, March 2018 print edition.
[19] Exhibit C, Affidavit and Report of Craig Heathco, C.E., pp. 21-22.
[20] *Id;* Testimony of Ted McIntyre, 6/15/2017, p. 189, ll. 25-30.
[21] LA R.S. 51:1431(4).
[22] Testimony of Ted McIntyre, 6/15/2017, pp. 196, ll. 14-32.
[23] *Id.*
[24] McIntyre at pp. 202.

Therefore, even if TPT attempts to narrow its claim of trade secrets from "turbine powered hydraulic fracturing" to only "digital controls for turbine-powered hydraulic fracturing," it is still not claiming to possess anything other than what is already widely known in the oil and gas industry and in the industrial-turbine industry at large, and which is already being used in the industry. Therefore, even under this narrower definition, they have still not described anything secret. Therefore, their claims are not subject to protection under the La. Uniform Trade Secrets Act.

**a. Firms other than TPT use digital devices to control turbines for hydraulic fracturing.**

As discussed above, Vericor markets their variants of the T55 turbine engine as the model TF40 and TF50 for this purpose.[25] The Vericor TF50 tubrine engine powers fracking pump through a gear-box.[26] The TF50 in this application incorporates a FADEC system and is capable of operation on either liquid or gaseous fuels. A FADEC is a generic reference to a digital turbine engine control.[27] The Vericor FADEC-controlled frack turbines were placed in service starting in 2015.[28] Similarly, General Electric has provided its industrial TM2500 gas turbine for oil and gas field fracking applications since 2013.[29] The TM2500 in this application also incorporates a FADEC system and operates on liquid or gaseous fuels.[30] The present and continuing use by Vericor and General Electric of FADECs to control turbines for hydraulic fracturing shows that such methods are "generally known to other persons who can obtain economic value from its use."[31] Therefore, digital control of turbine engines for hydraulic fracturing cannot be a trade secret under the definitions of the La. Uniform Trade Secrets Act.[32]

---

[25] Heathco Report, P. 21.
[26] *Id.*
[27] *Id.* at 9.
[28] *Id.* p. 21.
[29] *Id.* at 22.
[30] *Id.*
[31] R.S. 51:1431(4).
[32] *Id.*

**b. Using digital engine controls on turbines in hydraulic fracturing has been disclosed in patents and patent applications.**

Any information contained in a patent must, by definition, be disclosed to the public.[33] Therefore, that which is disclosed in a patent cannot be a trade secret, because it is not secret.[34] As the Federal Circuit observed in 2011, "A trade secret is secret. A patent is not. That which is disclosed in a patent cannot be a trade secret."

The '078 patent, which Plaintiff introduced into the record herein in support of its application for temporary restraining order and motion for preliminary injunction, discloses specifications for a digital controller that can be used to control turbine engines for hydraulic fracturing applications.[35] Therefore, the Plaintiff's own evidence shows it cannot carry the burden to prove digitally controlling a turbine engine for hydraulic fracturing is a secret warranting protection under the La. Uniform Trade Secrets Act.

The proffer of the '078 patent is not the only time TPT described its trade secrets as being contained in patents. Rather, on numerous occasions TPT has stated on the record that the details of what it specifically claims to be its trade secrets "are in the patents."[36] These repeated statements by TPT remove any doubt that the information it claims the Defendant's misappropriated as its trade secrets are actually described by patents. If TPT claims Defendants have violated its patent rights, then TPT should bring a patent-infringement case in federal court, but it cannot maintain a trade secrets claim in state court for the same technology.[37]

---

[33] *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1329 (Fed. Cir. 2013); "any specifications and tolerances disclosed in or ascertainable from the asserted patents became publicly available ... when the '877 patent application was published and, as such, could not [thereafter] constitute a trade secret") (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 149 (1989).

[34] *Id.*

[35] Exhibit D, Plaintiff's Exhibit 37 in support of the Motion for Preliminary Injunction.

[36] Testimony of Ted McIntyre, 6/15/2017, at pp. 190-196, 199, 202, 203, 205, 214.

[37] *Bonito Boats*, 489 U.S. at 151.

### B. What Plaintiff claims as trade secrets are readily ascertainable by proper means.

A trade secret must be "not readily ascertainable by proper means."[38] Comment (a) to La. R.S. 51:1431 states that "proper means" of acquiring information includes:

(1) Discovery by independent invention;

(2) Discovery by "reverse engineering", that is, by starting with the known product and working backward to find the method by which it was developed. The acquisition of the known product must of course, also be by a fair and honest means, such as purchase of the item on the open market for reverse engineering to be lawful;

(3) Discovery under a license from the owner of the trade secret;

(4) Observation of the item in public use or on public display;

(5) Obtaining the trade secret from published literature.

Even if the technology and information claimed by TPT as its trade secrets were actually secret, they would still not be protectable as trade secrets because such information is readily ascertainable by "proper means."

#### 1. The technology required to digitally control a turbine engine to power a pump for hydraulic fracturing is well understood within the turbine industry.

"Control system design and development is a mature and well understood technology within the industry."[39] "The control logic and control component requirements for the various types of gas turbines and applications are well understood within the industry."[40] "The physics of adjusting control parameters based on the fuel type and energy content is likewise a mature technology."[41] It is entirely reasonable to expect a controls engineer with a background in gas turbine design and development to be able to devise a digital control for a turbine frack pump based on publicly available information.[42] The Plaintiff claims this method as its trade secret. Therefore, the technology the Plaintiff claims as its trade secret is not

---

[38] R.S. 51:1431(4)
[39] Heathco at p. 12
[40] *Id* at p. 16
[41] *Id.*
[42] *Id.*

only discoverable by proper means, it has in fact been discovered and published throughout the industry. As such, the Plaintiff cannot carry its burden of proof to show that digitally controlling a turbine engine for hydraulic fracking is not discoverable by proper means. Therefore, the Plaintiff cannot carry its burden of proof to show the existence of a trade secret, and summary judgment in favor of the Defendants is appropriate.[43]

**2. An engineer with David Crowe's pre-2010 experience and education could derive a method of digitally controlling a turbine engine to power a frack pump by proper means.**

The expert report of Craig Heathco attached to his affidavit hereinreviews David Crowe's pre-2010 experience and education regarding turbine control systems design.[44] That report concludes that the information required by Crowe to facilitate the design of the control system Plaintiff claims to own is generally available from the public domain.[45] The report makes clear that a digital system for controlling a turbine engine for fracking could be independently invented, reverse engineered, and accomplished using controls available on the open market.

**a. Digital controls for turbine-powered hydraulic fracturing equipment could be independently invented.**

The Heathco report establishes that Crowe "has the education, experience and system expertise necessary to design a gas turbine control system capable of driving a high-pressure pump in fracking applications."[46] The report also makes clear that Crowe could do so "based on publicly available information."[47] Thus, Crowe or another qualified turbine engineer could independently invent a digital system for controlling a turbine for hydraulic fracking. Therefore, the Plaintiff's claim that any such system is its exclusive trade secret must fail.[48] And therefore, summary judgment should issue in favor of the Defendant.

---

[43] La. C.C.P. art. 966(D)(1).
[44] Heathco, Appendix.
[45] Heathco at 19.
[46] *Id* at 20.
[47] *Id* at 16.
[48] La. R.S. 51:1431(4)

**b. Digital controls for turbine-powered hydraulic fracturing equipment could be reverse engineered.**

In the same manner that a digital control system for turbine-powered fracturing could be independently invented, such a system could also be reverse-engineered "by starting with the known product and working backward to find the method by which it was developed."[49] David Crowe or another "qualified controls engineer, understanding the basic principles of gas turbine engine operation can either define a control system or modify an existing control system suitable for driving various devices, including high-pressure pumps."[50] Therefore, the technology the Plaintiff claims as its trade secret may be ascertained by proper means, and so is not a trade secret in the first place.[51]

**c. Digital controls for a turbine engine for hydraulic fracturing could be purchased on the open market.**

In the hands of a qualified engineer, "commercially available programmable logic controllers (PLCs) and even laptop computers," could serve as an effective electronic control unit (ECU) to control a turbine engine for use in powering a hydraulic fracking pump.[52] As the Heathco report informs:

> Regardless of the ECU selected, the fundamental control concept for a FADEC remains one of measuring basic turbine parameters and automatically adjusting fuel flow to the engine to maintain speed and match the power demand of the external load. Again, the FADEC control "laws" or "logic" selected by the controls engineer are based on the engine type, e.g. two- shaft turboshaft, rather than the type of driven device.[53]

Therefore, there is nothing special about powering a frack pump with a turbine engine controlled by digital means that would prevent a qualified turbine engineer from using products available on the open market to control such turbines.[54] Doing so is much more simple than controlling a turbine for aviation, for example, because controlling a turbine to power a frack pump does not have to meet various FAA requirements:

---

[49] *Id* at comment (a); Heathco at p. 1.
[50] *Heathco* at 2.
[51] La. R.S. 51:1431(4)
[52] *Id.* at 10.
[53] *Id* at 11.
[54] *Id.*

> ...such as: lightning strike, electromagnetic compatibility with the airframe, and system redundancy. These requirements are not present in industrial applications which need only provide equivalent functionality. This greatly expands the ECU hardware choices and software options available to the engine control or package designer.[55]

Therefore, the technology necessary to digitally control a turbine engine for hydraulic fracturing is generally available on the open market, *e.g.*, from the aviation industry. This fact prevents such technology from qualifying as a trade secret, and favors summary judgment in favor of the Defendants.[56]

### C. The alleged trade secret was not subject to efforts reasonable under the circumstances to maintain its secrecy.

#### 1. Plaintiff allowed the alleged trade secret information to be transferred to EcoStim without reservation.

The Plaintiff claims that the IDEC makes up at least part of the trade secrets it claims to possess in this case.[57] EcoStim Energy Services, Inc. ("EcoStim") obtained control settings and tuning information for the IDEC when it purchased used frack units out of the Green Field Energy Services, Inc. bankruptcy estate.[58] Those frack units were each equipped with IDECs.[59] TPT affirmatively represented to EcoStim that those units were not subject to any restrictions on their use from TPT, and that Eco-Stim could "operate the equipment as it sees fit without subjecting itself to any valid claims of infringement of TPT's intellectual property."[60] That is, not only did TPT not make reasonable efforts to maintain the secrecy, TPT explicitly waived whatever rights it may have had to any trade secret contained in these IDECs.

Once EcoStim purchased the frack units, they provided the IDEC tuning information to Crowe incidental to Arizona Turbine's contract to service the units for redeployment in the oil field.[61] Importantly, Arizona Turbine never needed to alter this information on the IDEC in order to service the frack units.[62] However, this information is part of what TPT claims to be a trade secret,[63] yet TPT never took any

---

[55] *Id.*
[56] La. R.S. 51:1431 comment (a).
[57] Ex. E, Testimony of Ted McIntyre, March 26th, 2018, p. 93, ll. 1-23.
[58] Exhibit F – Affidavit of David Crowe at ¶¶ 6, 7, 13, 14.
[59] *Id.* at 6.
[60] *Id* at 7 and referencing TPT correspondence to EcoStim, 10/10/2014.
[61] *Id* at 13, 14.
[62] *Id* at 15, 16.
[63] Testimony of Ted McIntyre, March 26th, 2018, p. 93, ll. 1-23.

steps to prevent EcoStim from obtaining this information, from the bankruptcy estate or otherwise, and never instructed EcoStim of any obligation to keep any such information secret.[64] EcoStim, having no reason to believe that this information was secret, took no steps to ensure that Crowe or any others maintained any secrecy about this information.[65] Therefore, information pertaining to either the design or settings of the IDEC was not the subject of "efforts reasonable under the circumstances to maintain its secrecy," but were instead explicitly waived.[66] And therefore, this information cannot be subject to protection as a trade secret.[67]

### 2. Plaintiff never required either Crowe or Tucson Embedded Systems to keep any of the alleged trade secret information confidential.

As further evidence that the information TPT now claims as trade secrets were not subject to reasonable efforts under the circumstances to maintain its secrecy, neither Crowe nor the TES ever entered into any confidentiality and nondisclosure agreement with TPT regarding the work it did on TPT's project.[68] TPT relies on the provisions of the vendor agreement between it and ATS for its claim for secrecy. However, it is undisputed that neither TES, Crowe, Arizona Turbine, Jackson, Foley, or Braccio were parties to that vendor agreement contract. In addition to freely transferring the alleged trade secrets to EcoStim, by not requiring confidentiality and nondisclosure agreements from the Defendants the Plaintiff failed to ensure that the alleged trade secrets—the tuning specifications and operational parameters of the IDEC—were subject to reasonable efforts to maintain secrecy. Therefore, the Plaintiff cannot prove this essential element to show the existence of a trade secret, and summary judgment should enter for the Defendants.

## II. Plaintiff Cannot Carry Its Burden to Prove Arizona Turbine's Products and Services Violate Its Alleged Trade Secrets.

In addition to proving the existence of a trade secret in fact, to prove liability for trade secret infringement "the plaintiff must prove the party receiving the secret

---

[64] Crowe at 7; See *In re Greenfield Energy Services, Inc.* Bankr. D. Del, Case No. 13-12783, at ECF. Doc 661.
[65] *Id.*
[66] La. R.S. 51:1431(4)
[67] *Id.*
[68] Crowe at 17; *See, Tucson Embedded Systems, Inc. v. Turbine Powered Technology, LLC* D. AZ case no. 14-01868, ECF Doc. 138 at p. 9., attached as Exhibit G.

information wrongfully breached its duty of trust or confidence by disclosing or using the information to the injury of plaintiff."[69] Even if TPT could meet its burden to prove the existence of a trade secret in the first place, it could not meet its burden to prove anything Arizona Turbine or Crowe has done has used that trade secret information to the injury of TPT. Therefore, TPT cannot prove each essential element of its claim and summary judgment in favor of the Defendants is warranted.

In its Petition, TPT attempts to detail its alleged trade secret as follows:

> Specifically, such trade secrets include but are not limited to formulas, patterns, set points, data compilations, programs, methods, techniques and processes invented and developed by TPT to control and integrate turbine engines used in the hydraulic fracturing business for stimulation of oil and gas wells. The trade secrets arose from extensive testing and modifications by McIntyre to turbine engines ordinarily suited for aviation use. Hydraulic fracturing operations and engine uses differ greatly from aviation applications, and required years of work and millions of dollars to develop because the aviation-engine operational information and controls do not transfer to McIntyre's newly-developed engine controls design or necessary parameters for this oil & gas extraction process.[70]

Based on this statement, the Court may conclude the Plaintiff's claimed trade secrets are (1) the "newly-developed engine controls design" and/or (2) "necessary parameters for this oil & gas extraction process." However, there is no evidence that any Defendant used the particular control design or the same parameters in any product or service to the injury of TPT. Moreover, TPT cannot come forward with evidence of precisely what this "newly-developed engine control design" actually consist of—i.e. what about it is "new;" and TPT cannot come forward with any set of "necessary parameters" that any Defendant has actually used. Therefore, TPT cannot carry its burden of proof on this essential element.[71]

### A. Arizona Turbine and David Crowe did not use any information TES claims as a trade secret when performing Arizona Turbine's service contract with Ecostim.

As stated above, EcoStim purchased used frack units from the Greenfield Energy bankruptcy estate, and those units were equipped with certain FADECS

---

[69] *Ponchartrain Medical* at 1091; La.R.S. 51:1431(2)(b)(ii)(bb).
[70] Second Amended Complaint at ¶108. N.b., the Heathco Report makes clear that controlling turbines for aviation is much more complicated and difficult that controlling turbines for a frack unit, as such control does not have to provide any of the numerous requirements such as lightning strike, electromagnetic compatability with an airframe, or system redundancy. Heathco at 10.
[71] La. C.C.P. art. 966(D)(1).

known as "IDECs."[72] The IDEC was developed by David Crowe while he was President of TES, and that development was done independent of TES's work involving TPT.[73] As part of EcoStim's acquisition of these units, in October, 2014 TPT assured EcoStim it could operate the equipment as it saw fit without infringing on TPT's rights.[74] In 2015, EcoStim hired Arizona Turbine to service the units and prepare them for re-use in the field.[75] When performing that contract, Arizona Turbine did not change the existing IDECs, nor did they replace those IDECs with new controllers.[76] Arizona Turbine only replaced pump control and datavan systems, which were developed and owned by Lime Instruments.[77] EcoStim returned the frack units to the field with the IDECs unaltered by anyone, including the tuning tables, safety parameters, pressures and flow settings.[78] These facts show TPT cannot carry its burden to prove David Crowe or Arizona Turbine made use of any engine control parameters, engine control designs, tuning information, safety parameters, pressure and flow settings, or any other information comprising TPT's claimed trade secret when performing on the contract with EcoStim. Therefore, the Defendants are entitled to summary judgment as a matter of law on these aspects of the Plaintiff's claims.[79]

### B. Arizona Turbine's controls designs derive from aviation technology and general principles of turbine engine control.

A FADEC is a generic term for a digital turbine engine controller.[80] Any FADEC can be programmed to control a turbine to power fracking pumps, because the fracking pump load parameters are all available from the pump manufacturer, which can be entered into the FADEC to control fuel to the turbine.[81] The digital engine controls designed by Arizona Turbine, like the IDEC itself, are simply versions of a FADEC, and do not replicate anything unique or special about the IDEC

[72] Crowe at 6.
[73] Crowe at 2, 3.
[74] Crowe at 7; TPT correspondence to Eco Stim, 10/10/2014.
[75] Crowe at 14, 15, 16.
[76] *Id.*
[77] *Id*
[78] *Id* at 10.
[79] La. C.C.P. art. 966(D)(1).
[80] Testimony of Ted McIntyre 6/15/2017 at p. 196, ll. 24-31.
[81] Heathco report at 15.

controller, nor do they make use of what TPT claims to be its trade secret.[82] Arizona Turbine developed these controls by making use of David Crowe's education, ability, and experience derived from aviation control technology and general principles of turbine engine control.[83]

### C. TPT has admitted it does not know that any control made by Arizona Turbine uses information from the IDEC or other information he may have acquired working for TES on the project for TPT.

In Court on March 26th, 2018, TPT admitted that the IDEC is "a controller just like a computer is a controller," and that anyone can buy a FADEC without violating TPT's claimed trade secrets just like they can buy a computer without violating any trade secrets.[84] When asked whether someone would violate his trade secrets by "buying a FADEC, hooking it up to a turbine engine, and then using that engine to control a frack pump," TPT responded, "I'd have to see what parameters they've programmed."[85] This answer acknowledges that it is possible that a FADEC can be designed for a turbine engine-driven frack pump using parameters that differ from what TPT claims to be a trade secret. When considering the digital engine controllers offered by Arizona Turbine, TPT admits it doesn't know anything about those controller's parameters, and it doesn't know whether they use the same source code as the IDEC.[86] So, therefore, TPT goes on to admit that it does not know for a fact that any controller designed or marketed by Arizona Turbine infringes on its trade secrets at all.[87] The affidavit of David Crowe states that these controllers do not make use of any IDEC information or any "tuning information, safety parameters, pressures and flow settings, or other information developed by while I worked with TES on the project with TPT." Therefore, TPT cannot carry its burden of proof to show the infringement of any trade secret by Crowe or Arizona Turbine merely by the fact that they subsequently designed digital controls.

[82] Crowe at 18.
[83] *Id* at 19.
[84] Testimony of Ted McIntyre 3/26/2018 at p. 95.
[85] *Id* at 96.
[86] *Id* at 96, 97 ll. 1-14.
[87] *Id.* ll. 11-14.



Case 4:19-ap-00260-BMW Doc 46 Filed 02/03/20 Entered 02/03/20 15:25:41 Desc Main Document Page 21 of 33

### D. TPT cannot create a de facto noncompete by claiming trade secrets on the skills and knowledge David Crowe has acquired over the course of his career in digital turbine controls.

TPT has no noncompete agreement with Crowe, but they seek to prevent Crowe from competing anyway, by claiming trade secrets over the skills and knowledge he has acquired over the course of his career. However, TPT cannot prevent Crowe from using the skills and intelligence he acquired over the course of his career working on industrial turbine applications; to do so would violate strong Louisiana policy.[88]

Louisiana maintains a strong public policy against finding implied noncompete agreements.[89] TPT's argument for the existence of a trade secret implies that any knowledge David Crowe gained while working for TES on the TPT/Greenfield project necessarily constitutes trade secrets that cannot be used to compete against TPT. However, absent an enforceable noncompete agreement, TPT cannot prevent Crowe or anyone else from making commercial use of the skill or intelligence acquired through experience received in the course of their work.[90] The conclusions of the Heathco report show that Crowe's work with turbines in the oil & gas industry are skillful variations of general processes known in this particular science and trade.[91]

The Defendants were not part of any noncompete agreement with TPT.[92] To prevent Crowe and the other Defendants from working at all in the area of turbine control in the oil & gas industry, as TPT seeks to do in this suit, would be to subject them to an implied non-compete agreement unlimited in time, scope or region. To do so would run contrary to the strong Louisiana policy against implied noncompete agreements.[93]

David Crowe had the education and experience necessary to build a digital control system sufficient to control a frack pump before he ever worked on the project involving TPT.[94] That he subsequently worked on turbine control design after he left

---

[88] *Lamb v. Quality Inspection Svcs. Inc.*, 398 So.2d 643, 648 (La. Ct. App. 3d Cir. 4/15/81).
[89] *Id.*
[90] *Id.*
[91] Heathco, generally; see also Restatement 2d of Agency, § 396, cmt. B.
[92] Crowe at 17.
[93] *Terry F. Day, Inc. v. Moore*, 815 So. 2d 335, 339 (La. App. 4th Cir. 3/27/02)
[94] Heathco Report at 20.

TES does not amount to proof that he used any information that TPT now claims as its trade secret. The fact is that Crowe does not need to use anything TPT claims to own; he can design better products on his own, using his own skills and knowledge, and without using anything from the TPT project. This supports the conclusion that TPT cannot carry its burden of proof to show actual use of any of the information they claim to own as trade secrets.

TPT cannot come forward with any other information to show that David Crowe or any defendant actually used what it claims as trade secrets on any product or in any service at any instance. Much less can TPT show any resulting harm therefrom. Therefore, TPT cannot carry its burden of proof on an essential element of its trade secret claim, and summary judgment in favor of the Defendants is warranted.[95]

**Conclusion**

The Plaintiff cannot have a trade secret as claimed because what it claims as secret is already known in the industry. Furthermore, the Plaintiff's claimed secret is readily ascertainable by legal means. Finally, the information the Plaintiff claims as secret was not the subject of efforts reasonable under the circumstances to maintain secrecy. Therefore, the Plaintiff cannot prove essential elements of its claim, warranting summary judgment in favor of the Defendant.

Even if the Plaintiff could prove the existence of some trade secret, it nevertheless cannot prove the actual use by the Defendant of any secret information to its injury. Therefore, the Plaintiff cannot prove this further essential element of its claim, which also warrants summary judgment in favor of the Defendant.

Wherefore, Defendants pray the Motion for Summary Judgment be granted.

[95] La. C.C.P. art. 966(D)(1).

Respectfully submitted,

**Meade Young, LLC**

Adam G. Young, 30124
John Alden Meade, 29975
556 Jefferson St., Box 7
Lafayette, Louisiana 70501
(337) 534-0200
(337) 210-7999
agy@meadeyoung.com

**Ramsay, Skiles & Streva**
S. Patrick Skiles, 26517
1915 Highway 182
Morgan City, Louisiana 70380
(985) 395-9247
(985) 395-3898 (fax)
pskiles@rsslawoffice.com

**T. Taylor Townsend, LLC**
Thomas T. Townsend (La. Bar 20021)
320 St. Denis St.
P.O. Box 784
Natchitoches, Louisiana 71458-0784
318-238-3612
318-238-6103 (fax)
taylor@taylortownsendlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record by facsimile, email and/or U.S. Mail, postage prepaid and properly addressed on this 7th day of December 2018.

Adam G. Young

STATE OF LOUISIANA

16th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. MARY

DOCKET NO. 130379 DIV. "F"

TURBINE POWERED TECHNOLOGY, LLC

VERSUS

DAVID CROWE ET AL

**LIST OF EXHIBITS**

Ex. A: Trial Testimony Transcript of Ted McIntyre, 6/15/2017.

Ex. B: TPT's Brief to La. Court of Appeal in 2018-CA-0881, page 2.

Ex. C: Affidavit of Craig Heathco, C.E., with related attachments.

Ex. D: Patent Materials (Ex. 37 to Plaintiff's Motion for Preliminary Injunction.)

Ex. E: Trial Testimony Transcript of Ted McIntyre, 3/26/2018.

EX. F: Affidavit of David Crowe, with related attachments.

Ex. G: Memorandum Opinion in *Tucson Embedded Systems, Inc. v. Turbine Power Tech., LLC,* U.S. District Court, District of Arizona.

Service owned fifty percent (50%) of TPT. And as such through that license agreement was the only company authorized in and to this day the only company ever authorized to use our IP. Prior to buying this equipment, and this letter is dated prior to that purchase, we authorized them and gave them the right to purchase the equipment with no fear that Green Field who had the license and anyone in the bankruptcy would come back to them and claim they own the intellectual property. The equipment was sold in an "as is" condition, did not have the upgrades, Cruzfrac and all the new embedded software which was done subsequently by Mr. Crowe's company in 2016.

Q. Okay. For the record we'll object to your characterization of what Mr. Crowe's company did or didn't do. But in the final paragraph this is actually referencing not Green Field, but TPT's intellectual property. Ecostem, the company you're currently accusing of violating your intellectual property, Ecostem may operate the equipment as it see's fit without subjective themselves to any valid claims of infringement of TPT's intellectual property. That's not a reference to Green Field, is it?

A. No.

Q. Thank you. All right. So let's talk about if we're going to get to the heart of it. What is your intellectual property?

A. Turbine driven hydraulic fracturing and turbine driven power generation, in particular as it relates to T53, T55 and TF40 engines.

Q. That's your intellectual property? Anything encompassing that is yours?



A. I believe that's what I said, yes.
Q. I just want to make sure we're very clear about what the scope of what you are claiming is. So that was -- tell me one more time.
A. Hydraulic fracturing utilizing T55, TF470 and T53 engines and power generation, as well, in the oil and gas industry.
Q. The source of this intellectual property is it patented?
A. Yes.
Q. Have you asserted a patent claim against my client?
A. We have not.
Q. What claim are you asserting against my client?
A. The fact that the patents that were submitted by Mr. Crowe while employed at Tucson Embedded Systems, those patents and trademark of Cruzfrac have since been assigned to TPT from TES, who was assigned the rights to that IP by Mr. Crowe and Mr. Crom (spelled phonetically) who also was a named inventor, both employees of Tucson Embedded Systems.
Q. So you are encompassing patents in your patents in your claim. Are you asserting a patent claim against my client or not?
A. I'm asserting that he stole the IP. You asked me, I have patents.
Q. And what is that IP? Because we've discussed today there were patents, there were trademarks, there were copyrights, there were trade secrets. We need to get specific. What are you asserting against my client that is your intellectual property that he's in violation of?

EXAMINATION BY MR. MEADE: (Continuing)

Q. So you're claiming any ability by any entity to control the output RPM's of a gas-powered turbine engine?

A. No, I'm not making that claim.

Q. Then what are you claiming?

A. I'm claiming controlling a turbine engine for hydraulic fracturing. And that includes, not only the speed of the output of the turbine --

Q. So it does include the speed of the output turbine, right? The dry shaft speed.

A. That's one portion of it.

Q. Okay. Keep going.

A. It also goes to controlling the, and managing the system as it applies to constant rate, which is termed cruise control. Cruise control is not Ted Cruz, it's cruise control as in cruise frac. In fracturing there's two things that matter; pressure and rate. The more rate the more barrels per minute will increase the pressure. One of the biggest challenges in fracking is maintaining rate when more pumps come on line. We have multiple patents that address controlling multiple engines and pumps, incidentally in the patents, and the Cruzfrac controls that rate by excelling and decelling the engine via continental control valve and/or any similar valve that would normally be used in an IDEC, which is just basically an industrial controller, some terms of FADEC, Fully Authorized Digital Electronic Control, there's all sorts of acronyms, but ultimately they're all the same. You control an engine and consequently, by controlling the engine you control the pump and

units. We TPT at the Port of West St. Mary in Franklin, Louisiana created/invented the first turbine driven frac equipment with a digital engine controller.

Q. Which you either could of patented, didn't or didn't assert against my client. And so that's -- I mean, we keep kind of going around in circles here. You're making large claims about inventing things, but you don't have patents or if you have them you're not asserting against my client. What I'm trying to get an understanding of is what my client is doing right now that you contend violates the things that are your petition or are in that injunction that aren't patents because they're not listed, aren't copyright, aren't trade marks, but what is the trade secret that he is currently misappropriating. I for the life of me --

Q. Mr. Crowe is operating under our master vendor agreement. He, unbeknownst to us filed for patents thinking he had free right to do so. He did not.

Q. So why isn't that in your petition? Why isn't that in the injunction?

A. We have the assignment from Tucson Embedded Systems.

Q. See you're saying now --

A. He filed patents as Tucson Embedded Systems. He was their president. Everything he learned he learned while working on this equipment at our facility at the Port of West St. Mary and, subsequently, in the field testing. He went out and filed these patents, unbeknownst to us, after going to Arizona and going back and forth in that litigation. It's safe to say that the principals at Tucson Embedded Systems

realized what Mr. Crowe had done and we have since been assigned all that IP.

Q. So he improperly filed for patents.

A. Absolutely.

Q. Why isn't that in your petition? Why isn't that in the injunction?

A. I just said, we did not know he did it when we filed this petition.

Q. Right. So I guess, you have some other complaints that maybe you're going to file and amended suit and maybe we will learn about all your other complaints about what my client and other clients have done.

BY MR. PANAGIOTIS:

Your Honor, I object. He's being argumentative on this. And he's kind of testifying.

BY MR. MEADE:

I'm trying to get him to be specific within the confines of his petition and the injunction about what my client is doing wrong. And he goes on and on about patents that he improperly filed.

BY THE COURT:

You made it pretty clear to me.

BY MR. MEADE:

Okay. So if that's not part of his petition and it's not part of the injunction it can't be used to sustain a Preliminary Injunction.

BY MR. PANAGIOTIS:

Object. That mischaracterizes what he just said. He never said it wasn't part of the petition. The petition and the Preliminary Injunction Petition and everything that went into it, all the evidence that we have speaks for itself, Your Honor.

BY MR. MEADE:

Well, exactly, so I'm asking him to make a tie between what he feels, what he's actually asserted against my client, not what he might have thought that's another violation that he hasn't brought before this Court. I'm trying to get him to focus on what he has put before this Court. So I think hearing these stories of these other potential violations, but they have nothing to do with this current injunction.

EXAMINATION BY MR. MEADE: (Continuing)

Q. So last point here. Can you give me an example of a non-infringing use or something that David Crowe can do in the field of using gas powered turbines in the hydraulic fracturing field that wouldn't be a violation of your nebula of intellectual property?

A. Well, he can't certainly do anything as it relates to hydraulic fracturing and power generation. And he testified that he had a release from TES giving up his rights to Army, Ratheon and everything else, but yet earlier he testified to the fact that he hired Stonegate, our vendor, Blaine Lafleur who changed names to work on a AGT1500 turbine Honeywell for an

Army generator. So he's violating that agreement with TES, but once again it goes to our IP and we've submitted the patents as evidence and you can certainly read through them that that's covered as well.

Q. Okay. And you haven't asserted that in your petition and it's not part of the --

A. I have asserted our IP and I'm being specific about the IP.

Q. The patents which as we know, patent infringement is an exclusively Federal jurisdiction, so we know we're not asserting patent infringement against my -- we would be in Federal Court if you were doing that. So I appreciate the --

BY MR. PANAGIOTIS:

Objection. Is there a question in all of that?

BY MR. MEADE:

Well, we begin trying to bear down, but actually I think I'll tender now and subject to a redirect we have a final rebuttal of what Mr. McIntyre has just said from our client, Mr. Crowe. Thank you, Your Honor.

BY MR. HOGGATT:

Your Honor, I'll be brief.

**CROSS EXAMINATION**

BY MR. HOGGATT:

Q. Mr. McIntyre, would please tell the Court, there's apparently some difficulty understanding what

(8,000) gallons a minute. We've been at the Port for twenty (20) years and that's been one of our core products. But, once again, we're running these turbines off-speed. We're driving pieces of equipment that were designed to be driven. We've done automotive applications. As I've said the motorcycle. But controlling a turbine is done through fuel. You control the power just like a re-cip engine, gasoline engine in your car, diesel, by the amount of fuel you put in. Fuel, fire and air; the same principals apply. The difference is is we're not compressing air in a cylinder, we're blowing that exhaust, jet exhaust against a power turbine wheel. So we developed a system to manage the control of that power output long before anybody else ever did. And we adapted that from technology from our fire pumps and our marine applications. Just keep in mind the LCAC doesn't engage a gear box and stop the turbine and do all the things that we do. So that took technology that was developed in-house, trade secrets, if you will, protected by NDA's and trademarks and ultimately, the patents that we know were assigned to us and we control that was all derived from all of our work product. And in particular, my experience going back to 1973 when I first went to work for Halliburton and, once again, I brought that oilfield technology and I race boats and all this stuff. So my background -- and I have a pilots license -- goes across a lot of different joinders that use turbine. And I've done jet engines, track dryers, where we take a jet engine we dry the Indianapolis and use the heat coming off of that.